Please call the first case. The first case this morning is 5-14-0579 W.C. Alyssa Adair v. Madison County District Clerk's Office. Mary Massa, the appellant. Matthew Kelly, for the afternoon. Counsel, you may proceed. Good morning. May it please the court. My name is Mary Massa, and I represent the appellant in this case, Alyssa Adair. Ms. Adair works as a deputy clerk in the family division at the Madison County Circuit Clerk's Office. Her job duties involve a lot of hand-intensive activities, including spending at least six hours or two-thirds of her day typing, keyboarding on a computer, lifting heavy files, particularly on Wednesday when she has to pull 60 files for her family court judge. She does more typing on Wednesdays also when she sits with her judge in the courtroom and transcribes orders for the judge as they go along through the caseload. She started having difficulties in her hands, including not only cramping in her hands and pain in her hands, but also triggering in her right little finger. And that precipitated her need to go to see the doctor. She told her supervisor, I'm having trouble with my hands, I need to go see the doctor. So her supervisor testified that she knew of this because she had to have a reason for giving her a work excuse to go see the doctor. She saw Dr. Penn, who is an orthopedist. He examined her. He determined that she had early carpal tunnel syndrome, but she also had a right trigger finger, and he injected that finger, hoping that that would do the trick for her difficulties. Well, as time went on, the condition was not getting any better, so she went to see a hand specialist in the orthopedic surgery field. I think we're probably familiar with all of the detailed facts. It appears that the case turns on a conflict between the doctor's opinions. You had Dr. Beatty, I believe. Yes, Your Honor. The other side had Dr. Lionelli, and the commission chose to believe Dr. Lionelli over Dr. Beatty. And they actually provided some reasons why they chose Lionelli over Beatty. And one of the reasons was something of a compelling reason. They felt that Beatty had ignored some tests that he had ordered, that the tests had indicated some contradicted results, and they were troubled by that. So can you address that? Yes, as you know, Your Honor, we're basically just dealing with the carpal tunnel diagnosis here. And Dr. Beatty did a full examination and did find a positive Tonell sign at the right polymer side of her hand, which he indicates means that the person has some neuropathy in the median nerve. He also found positive Tonell sign on both wrists, which indicates, as Dr. Beatty testified, compression of the median nerve at both wrists. So with that positive examination, he diagnosed bilateral carpal tunnel syndrome. But he did something further. He did order electrodiagnostic tests, which were normal. And Dr. Beatty said, that does happen in 15 to 18, I believe, percent of patients that he sees, that they have normal electrodiagnostic tests, but then they eventually wind up needing to have carpal tunnel surgery. And that's what happened with this particular patient. Could you tell us why the commission could not rely on the opinion of Dr. Lionelli? What's wrong with it? Dr. Lionelli did not believe my client had carpal tunnel syndrome. We understand that. And that's why he did not find a causal connection. So if you look at the basis for his opinion, that's where I'm saying it's based on speculation. He said, I don't believe she has carpal tunnel, but I think she probably has some kind of autoimmune disorder. And in order to really diagnose that, you have to have testing. You have to be seen by a specialist. And none of that was done. How does it undercut his overall opinion that the claimant's condition was not bilateral carpal tunnel? How does that destroy his opinion that it wasn't bilateral? I mean, he's given speculation about other causes, but that doesn't destroy his overall opinion, does it? Well, I think the proof is in the pudding here, Your Honor. Dr. Beatty did go forward with the bilateral carpal tunnel surgeries. And in both operative reports, he was able to visualize compression on the median nerve, which, as you know, is the diagnosis or is the epitome of carpal tunnel syndrome. Not only that, my client, after her surgeries, had relief of the hand tingling and numbness. She had relief of the pain in her hands. And she had relief, of course, of the trigger finger, which was a separate surgery done. She had good strength in her hands. Not perfect, but better strength in her hands than she did before the surgeries. So if Dr. Beatty's opinion is off that she didn't have carpal tunnel surgery, why did she have a positive result after surgery? And Dr. Lionelli even admitted that if there is a positive result after surgery, that is an indication of support for a diagnosis of the carpal tunnel syndrome. But Lionelli, I was just going to say, Lionelli was given her job description and apparently engaged in a fairly lengthy history taking to get an idea of what her job duties were. And he expressed the opinion that her typing wasn't, she wasn't doing enough typing in order to constitute repetitive activity that would have led to this condition. So why isn't the record sufficient to support that opinion? And then why wouldn't that opinion be sufficient to support the commission's decision? Well, I think if you look at Dr. Lionelli's opinion, he was made aware of the fact that she did a lot of typing. The Corvell job analysis said she spent two-thirds of her day doing keyboarding or typing. Dr. Lionelli looked at the difference between an aggravating condition and a causation opinion and he was unable to express a difference between the two. He looked at the fact that my client was having symptoms when she was doing these activities and he totally threw that out as being relevant. He apparently thought she wasn't typing enough during the day. But this court has over and over supported a causation opinion by a doctor who ties in the symptomology that the claimant has with the job that she's doing and at the time that she's doing that job. And that's what my client told Dr. Beatty was going on and she also told Dr. Lionelli that. But he threw that out. In his opinion, I believe he said for it to be aggravation, there has to be some change in the pathology. There has to be some narrowing physically and anatomically of the canal. But with aggravation, you look at does the condition get worse? And that's what was going on with my client. It started out maybe months before she went to see Dr. Penn to begin with, but as she progressed with her job, her hand symptoms kept getting worse and worse as she was doing her job, lifting the heavy files, carrying the files to the judge's chambers and the courtroom, typing for at least two-thirds of the day. Did Dr. Lionelli suggest other potential causes for these problems that she was experiencing? He noticed during his examination that she had swelling in her hands and I think he said that's not indicative of a carpal tunnel situation. But you'll recall that Dr. Penn did order x-rays of the hands, which did not show that my client had any arthritic condition, which would be an explanation for swelling in the hands. He did have the benefit of Dr. Beatty's positive results on the examination. And I think combined with the positive results, which Dr. Bullet Beatty believes is the gold standard for diagnosing carpal tunnel, he only orders the other EMG NCV tests to confirm that diagnosis or to persuade an employer that this is a causally related condition that needs to have the surgery approved. And he testified in this case that that's why he ordered those tests. But he says those tests are not the end-all for diagnosis. You don't have to have positive results from those tests. I referenced the percentage of patients that can have normal results from those tests. And as I said before, in this case the surgery bore out his opinion. And Dr. Lionelli gave his opinion before the surgery. That is correct. And so he was unaware that the surgeon visually observed compression of the knee. I'm sure that the respondent asked for this IME with Dr. Lionelli because Dr. Beatty's office was trying to get the surgery approved. In fact, I think the examination was in January and then the surgery started in April and June. And so he also would not have known that she had a good result. That's correct. But I think he did opine in his deposition that a good result would be supportive of a diagnosis. So in that regard, I think Dr. Beatty's diagnosis was borne out and the commission put too much strength or belief in Dr. Lionelli's opinion where it was not based on solid medical diagnosis. What was wrong with Lionelli's opinion? He said it wasn't based on solid medical diagnosis. He did an examination and formed an initial impression that he believed she had some kind of possibly autoimmune disorder. And he said in order to confirm that, you're going to have to have this lady examined by a rheumatologist. That was never done in this case. There was never any indication that my client had ever sought any treatment for an autoimmune disorder. Well, wasn't that based on some objective test that she had a difference between one arm and the other? Wasn't that a test done that both Beatty and Lionelli referred to? Dr. Beatty did the Tonell's test and the Phelan's test. So did Dr. Lionelli, and he found negative in one of them. But the difference in the testing I don't think is supportive of an absolute non-diagnosis for carpal tunnel. Well, but it may take Lionelli down the path of saying this is atypical. I think they may say it was atypical. And I would admit that it is. Down the path of saying that there might be some other cause for the symptomology than repetitive activity in the workplace. And if that were the case, then why did my client have the results from the surgery that Dr. Beatty had that were positive, and why was Dr. Beatty able to visualize the compression? Well, can't you have the condition but not causally the condition not causally related to the activity of the work? I mean, you're assuming one subsumes the other, but that's not the case, is it, necessarily? Well, I think if you look at my client's testimony, my clients report to both physicians that when she's doing her essential job functions of typing, keyboarding, of lifting the files from the shelving, up to 60 files on certain days, and when she did that work, she had tingling in her hands that was so constant that she was having to shake them out. She would have triggering in her finger when she was doing this. I mean, all of the symptoms that she was having with pain in her hands and whatnot, those were all connected in her mind with the work that she was doing. And that's why she went to see the specialist. Well, that has something to do with notice and connected in her mind. But now we're dealing with whether physicians, experts say this is actually medically connected. But I think in that regard, this court has recognized that provocation of symptoms, the beginning of symptoms, symptoms being produced during work activities, is support for a doctor's medical opinion. Well, it could be. There's also a great body of law that says we're not supposed to substitute our judgment for the commission on matters of medical evidence, conflicts in the evidence, and the weight to be assigned to the expert testimony. Well, what I guess I would say is with regard to Dr. Lionelli's opinion that, hey, this has got to be something else. It's got to be something in the autoimmune because of her atypical examination. Why did she have relief after the carpal tunnel surgery? She did. I just want to hone in on your argument here and make sure that I understand it. You're saying Lionelli got it wrong in terms of what the actual diagnosis was. But does that necessarily then mean that his underlying opinion or his opinion that she was not engaging in activities repetitive enough to cause a condition like that are fatally flawed? Well, I think if you look at Dr. Lionelli's deposition, he based his opinion that her work duties weren't related to her condition on the condition that he believed she had, and that was some autoimmune disorder, which would be something that is systemic as opposed to something that comes about via the person's work duties. Thank you, Counsel. Thank you very much. Counsel, you may respond. Your Honors, Counsel, may it please the Court, Matt Kelly on behalf of Respondent Madison County. It's our position that this is a classic case of a disagreement in the medical testimony, and as such, the decision should be affirmed. Counsel for Ms. Hedare suggests that Dr. Lionelli predicated his causation opinion on the diagnosis. As I pointed out in my brief, she does not cite to any evidence in the record that supports that proposition. And when I pointed that out in my brief, she replied in a reply brief, oh, no, there is some evidence that supports that proposition in the record. And what she cited to was Arbitrator Luskin's language in the initial arbitration decision that found Dr. Lionelli more persuasive than Dr. Beatty. What do you make of her argument? She says, aha, to that. Obviously, the surgery produced relief, so that's very compelling evidence of the fact that she did have it. Again, I think the Court has asked appropriate questions. Whether she had the diagnosis of carpal tunnel syndrome is a different question than whether whatever diagnosis she had was causally related to her employment activities. Dr. Lionelli felt she did not have carpal tunnel syndrome, but he also expressed the opinion that regardless of what her diagnosis was, he felt that whatever difficulty she was having with her upper extremities were not related to her employment activities. And he based that opinion upon a detailed discussion with her about her job duties. He based that opinion upon her physical examination, in fact, on her serial physical examinations, which were different from the time she saw Dr. Penn to the time she saw Dr. Beatty to the time she saw Dr. Lionelli, plus a chart review, including her treatment records with Dr. Penn and Dr. Beatty and additional information from Madison County. And Dr. Lionelli, if you read his deposition all the way through, you will see that based on the swelling, he would not have been surprised to find some compression in her carpal tunnel. You will also see that he testified that he would expect maybe some relief of her symptoms if, in fact, there were some compression noted at the time of surgery, but he would not have anticipated complete relief of her symptoms. And, in fact, she testified there was not complete relief of her symptoms. She had ongoing weakness in her hands. She had ongoing complaints of pain in her hands. Following the surgery? Following the surgery, correct. So, again, this is a classic case of a difference of opinion between the two doctors, and it does not seem to me there's any set of circumstances under which manifest weight of the evidence allows this court to overturn the decision of the arbitrator as affirmed by the commission, as affirmed by the Circuit Court of Madison County. Thank you, Counsel. Thank you. Counsel, you may reply. I think when Dr. Lionelli did the IME with my client, he focused on what she reported to be her four main job duties, essential job duties, typing, filing, answering phones, and waiting on the counter. Now, I think that may have played a part in any kind of opinion that he might have had that would say that, you know, regardless of her job duties, they aren't repetitive enough to cause any type of condition of ill-being. He would not accept the fact that she had carpal tunnel syndrome. He, like I said before, thought she had some type of autoimmune disorder because of the atypical examination, but if he didn't believe she had carpal tunnel syndrome, the compression in the hands, the compression in the wrists, it wouldn't have been borne out by the surgeries. And while she did testify after the surgery she had some pain, she did say that the pain was improved. And she did say she was not totally back to full strength in her hands, but the strength in her hands was way better than it was before she had the surgeries. So I don't know that you can read into that, that my client did not have a positive result from the carpal tunnel surgeries. Well, the opposing counsel is saying that would be expected because there's compression through swelling. And so that this surgery would apparently, I'm just making an assumption, would reduce that swelling so you would get some relief. But that doesn't address all of the issues she was having with her hands prior to this surgery. Not only the pain in the hands and the triggering, but she also had quite a bit of numbness in her hands. And that, she said, was eliminated by the surgeries. Thank you.